650 So.2d 363 (1995)
STATE of Louisiana
v.
Larry WALKER and Keith Ezidore.
No. 93-KA-632.
Court of Appeal of Louisiana, Fifth Circuit.
January 31, 1995.
*365 Richard P. Leyoub, Atty. Gen., Julie E. Cullen, Asst. Atty. Gen., Baton Rouge, for plaintiff-appellee.
Benjamin C. Vega, Jr., Donaldsonville, for defendant-appellant, Larry Walker.
Walter C. Dumas, Baton Rouge, for defendant-appellant, Keith Ezidore.
Before H. Charles GAUDIN, DUFRESNE and WICKER, JJ.
GAUDIN, Judge.
Appellants are Larry Walker and Keith Ezidore, who were convicted in St. James Parish of the second degree murder of Ralph Flowers on January 14, 1991. Flowers was stabbed approximately 20 times and died of chest wounds.
Both Walker and Ezidore were sentenced to life imprisonment without benefit of parole, probation or suspension of sentence.
On appeal, Walker assigned these district court errors:
(1) the trial judge erred in permitting peremptory challenges by the prosecutor,
(2) the physical evidence did not substantiate the facts of the case as related by a prosecution witness, Tory Burnette, and
(3) the verdict was contrary to the law and evidence.
Ezidore assigned nine[1] errors. He argues that the trial judge erred in:
(1) denying the motion for change of venue,
(2) in excusing a prospective juror for cause over defense counsel's objection,
(3) in allowing the prosecution to make irrelevant and immaterial statements,
(4) in permitting the prosecutor to make prejudicial statements,
(5) in allowing hearsay testimony,
*366 (6) and (7) in permitting the introduction of photographs of the victim's body, allegedly with no probative value,
(8) in giving improper jury instructions, and
(9) in denying defense counsel's motion for a new trial.
We have carefully reviewed all of these assignments and find no reversible error; therefore, the convictions and sentences are affirmed. We shall first consider Walker's three assignments of error, then Ezidore's. Walker's assignments of error are quite different from Ezidore's.

LARRY WALKER'S ASSIGNMENT NO. 1
In Walker's first assignment of error, he argues that the state peremptorily challenged six prospective jurors only because they were black, in violation of guidelines set out in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). According to Walker's brief, the final jury makeup was "fairly evenly balanced" between whites and blacks although the prosecutor allegedly tried to establish a "white edge" among jurors.
The record indicates that the prosecutor gave racially neutral reasons for excusing these six potential jurors, as follows:
Juror Fluenceknew Walker and his wife and could not be fair;
Juror Jameswould be influenced by prior service on a federal jury;
Juror Ferdinandacquainted with both defendants;
Juror Griffinalso knew both defendants;
Juror Singletondid not want to serve on the jury because of her three small children and because she had no interest in the case; and
Juror Florencehad eye contact and exchanged hand gestures with Ezidore, who explained that he thought Florence was a cousin from Gramercy.
During jury selection, the trial judge was well aware of Batson v. Kentucky, supra; he said that if any challenge appeared to be racially motivated, he would not allow it. The trial judge listened to the prosecutor's reasons for excusing the six listed possible jurors and he (the trial judge) was satisfied that there was a purposeful and non-racial reason for each challenge.
This assignment of error is without merit. Walker did not at trial and has not now on appeal established a prima facie case of racial discrimination in jury selection.

WALKER'S NO. 2
Walker contends in this assignment of error that the discrepancies in Burnette's statements made his overall testimony unbelievable. Burnette was 13 years of age when Flowers was murdered and was almost 16 when he testified at trial. He was the state's primary witness.
Burnette gave three recorded statements to police officers, on September 17, October 25 and November 4, 1991. Although there were some variations in these statements and in Burnette's trial testimony, Burnette straightforwardly said, over and over, that Walker and Ezidore went to Flowers' place of business to rob him, with Burnette acting as lookout after refusing a more active role in the crime. Ezidore, according to Burnette, grabbed and held Flowers while Walker did the fatal stabbing.
Most of the variations were in regard to the nature and extent of Burnette's own involvement. He was also somewhat inconsistent in his description of Flowers' wounds and in his recall of the weapon used in the attack. Burnette said that an ice pick was used while other evidence showed that a pick ax and/or a knife caused Flowers' death.
The doctor who performed the autopsy, Dr. Alfredo Swarez, a forensic pathologist, described the various wounds on Flowers' body. Approximately 20 wounds were caused by a weapon with a sharp blade, Dr. Swarez said, and some by the pick ax found at the crime scene.
In any event, the jurors were aware of the variations because of probing cross examination. The jury also knew that Burnette had a criminal record as a juvenile and had been promised immunity in exchange for his testimony; nonetheless, Burnette's description of events leading up to the murder and his *367 consistent testimony about Walker and Ezidore killing Flowers were accepted as true.
In criminal prosecutions, state witnesses often do not work from nine to five or sing in church choirs but their testimony can nonetheless be convincing.
It is not the function of appellate courts to reassess credibility of witnesses, as stated in State v. Matthews, 450 So.2d 644 (La.1984), and other cases. The jurors observed and listened to Burnette and chose to believe his trial testimony. This was well within their province.

WALKER'S NO. 3
Walker admits that there was some evidence of his guilt but, in this assignment of error, he says that the overall evidence was not sufficient to prove his guilt beyond a reasonable doubt. The guilty verdict, he argues, was contrary to the adduced evidence and the law.
In addition to Burnette's testimony, the state offered other proof of Walker's connection to the Flowers homicide. Walker's former live-in girlfriend, Wyonna Dewey, testified that Walker admitted killing Flowers. He also related to Dewey other facts related to the murder that were not known by the general public, such as the fact that a pick ax had been used in the attack and that a vodka bottle had been found at the murder scene in a police attempt to frame him.
Shortly after the murder, according to Dewey, she asked Walker if he knew anything about Flowers' death. Walker denied any knowledge. But, Dewey testified, Walker started drinking more and he became scared, paranoid. Walker told Dewey that the vodka bottle had been placed at the murder scene "... because they knew I used to work there and I drank vodka."
Dewey said that several weeks after the homicide she asked Walker again: "Did you kill that man?" From Dewey's trial testimony:
"He told me, he said, `Black,[2] if I had killed him,' he said, `I wouldn't tell you ... you'd go back and tell your friends ...'
"... I asked him again, and he had been drinking, but he wasn't really drunk, you know, and so he said, `Well, yeah, Black, I killed him.' And he said, `What are you going to do about it.'"
Dewey said that after this admission, she "... didn't bring it up no more."
Dewey was a reluctant trial witness. She said that she did not want to testify. She was arrested as a material witness and placed in protective custody just before trial. Dewey acknowledged that otherwise she "... probably wouldn't have showed up for court..." She did say, on the witness stand, that her testimony was truthful and that neither the police nor prosecuting attorneys at any time put words in her mouth or told her what to say.
On cross examination, Dewey acknowledged that she had used drugs on weekends and that there was a pending charge against her for possession of cocaine. Also on cross, she said that Walker had told her: "If I killed Flowers ..." On redirect, however she again said that Walker had admitted doing the killing.
There was also testimony about Walker's fingerprints being found on Flowers' red Ford pickup truck at the homicide scene. Walker had been employed by Flowers but he had been laid off at least three weeks before the murder. Further testimony indicated that the truck had been washed and waxed between the time Walker was laid off and the time Flowers was murdered so Walker's fingerprints could not have been on the truck in connection with his former employment.
When questioned by police officers about his fingerprints on the truck, Walker said that he had not come in contact with that truck for three weeks prior to the murder and that it was impossible for his fingerprints to have been found on the truck.
Walker's fingerprints on the passenger side door and on the hood of the truck were positively identified by a fingerprint expert.
*368 A reviewing court must, following Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), determine whether the evidence, viewed in the light most favorable to the prosecution, permits a rational trier of fact to find guilt beyond a reasonable doubt of each and every element of the charged crime.
In arguing that this standard was not met, Walker cites and relies on State v. Mussall, 523 So.2d 1305 (La.1988), wherein a conviction was reversed because there wasn't any evidence corroborating the victim's testimony about being robbed in daylight on a French Quarter sidewalk and because of other eccentricities and unusual circumstances.
Here, in Walker's case, there was believable corroborative testimony and there was fingerprint evidence. A rational trier of fact could have found that Walker and Ezidore murdered Flowers.

KEITH EZIDORE'S ASSIGNMENT NO. 1
In this assignment of error, Ezidore contends that his motion to change venue was erroneously denied. The trial judge conducted a hearing, at which 13 newspaper articles published between January and November, 1991 were introduced. The trial was in January of 1993.
In addition, Ezidore called Adrienne Percy, whose firm conducted a public opinion survey of 300 registered voters in St. James Parish. Percy said that 18 per cent recalled Flowers' murder but only 11 persons remembered Ezidore's name as one of the homicide suspects.
The grounds for a change of venue are stated in LSA-C.Cr.P. art. 622:
"A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
"In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
Ezidore's attempted showing of prejudice fell short. The trial judge did not abuse his discretion in denying the change of venue motion; furthermore, our review of the voir dire did not reveal any prospective or selected juror influence, one way or the other by newspaper accounts of the murder.

EZIDORE'S NO. 2
Ezidore claims in this assignment of error that the trial judge committed error by excusing a prospective juror for cause over defense counsel's objection. This juror is not identified; consequently, there is nothing specific for this Court to review.

EZIDORE'S NO. 3 AND 4
In these assertions of error, Ezidore finds fault with the prosecutor's reference to Saddam Hussein in his opening statement. The assistant district attorney said:
"... one of the things that you're going to hear is that Mr. Flowers at some point was sitting at the end of the bar watching the TV. This was the day Desert Storm was starting, January the 14th. It was the day thethe last day that President Bush had given Saddam Hussein to clear out of Kuwait. It's when the bombing started ..."
An objection was made because Saddam Hussein and Desert Storm were not relevant. On appeal, Ezidore cites State v. Bender, 598 So.2d 629 (La.App. 3 Cir.1992), writs denied at 605 So.2d 1125 (La.1992). In Bender, the Third Circuit said that the prosecutor's comment in closing argument comparing the defense to a "Saddam Hussein defense" was improper; however, the trial judge's failure to admonish the jury to disregard the reference was harmless in light of overwhelming evidence of guilt. Ezidore says the evidence against him was not strong; therefore, the early reference to Saddam Hussein constituted reversible error.
Ezidore's reliance on Bender is misplaced. The prosecuting attorney, here was trying to give the jury factual information about the victim's actions and whereabouts prior to his murder and to relate the incident to a particular time frame. Neither Ezidore nor his defense was compared to Saddam Hussein or Desert Storm. We see no real *369 harm in the failure of the trial judge to admonish the jury. The prosecutor merely said that Flowers, before his murder, was watching Desert Storm action on television. This reference to Saddam Hussein here and the reference to a "Saddam Hussein defense" in Bender were very different. If there was error in the instant case, it was harmless.

EZIDORE'S NO. 5
This assignment of error is concerned with alleged hearsay testimony. While a police detective, Brent Ditcharry, was on the witness stand, he was asked on redirect these questions by the prosecutor:
"BY MS. CULLEN:
Q. Detective Ditcharry, in connection with any of the statements on whatever days, September, October and November, did anybody suggest to Tory Burnett what he was supposed to say?
A. I didn't know anything to suggest. He suggested to us.
Q. Did anybody elsewhether Lonny Cavalier or Doug Peters, any other of the officers that were present, did they suggest anything?
A. To my knowledge, no ma'am.
Q. Did you suggest any names of any people?
A. No.
Q. You or any other officers in your presence suggest any names to Tory Burnett about any information he was providing you?
A. Not to my knowledge.
Q. Now, in the statement that Mr. Grimley referred to, the one from September 17th, where Tory indicated he was telling the truth, did the name Keith Ezidore come up in that statement?
A. Yes, ma'am.
Q. Whowhat individual brought up the name of Keith Ezidore?
MR. GRIMLEY:
Objection.
THE WITNESS:
Tory Burnett.
MR. GRIMLEY:
Your Honor, this is hearsay ..."
(The foregoing is copied here as it appears in the transcript. Burnette's name is misspelled; the last "e" is left off.)
Earlier, on direct examination and again on cross, this witness had been asked about his part in the murder investigation and in particular about the statements given by Burnette. Detective Ditcharry had said repeatedly that Burnette's statements were completely voluntary without police prompting. The objected-to question, which the record shows was in fact answered before a ruling by the trial judge, was not prejudicial. Further, Burnette at no time said that either Ezidore's name or Walker's was suggested to him by a police officer.

EZIDORE'S NO. 6 AND 7
Several photographs of Flowers, showing body wounds, are in evidence. Ezidore argues that they were used for their prejudicial rather than probative value.
The mere fact that a photograph is gruesome does not in and of itself render the evidence inadmissible. Generally, photographs of a homicide victim's body showing fatal wounds are relevant to prove death, to corroborate other evidence, to establish the location, severity and number of the wounds and to prove the identity of the deceased. See State v. Eaton, 524 So.2d 1194 (La.1988); and State v. Moore, 498 So.2d 82 (La.App. 5 Cir.1986).
The pictures of Flowers show the severity of the attack and were used mainly to prove specific intent to kill or cause great bodily harm, a necessary element of second degree murder. Any prejudicial effect did not outweigh probative value.

EZIDORE'S NO. 8
By this assignment of error, Ezidore contends that the trial court's jury instructions were erroneous because they contained a statement about flight when no evidence of flight was presented. The state argues that there was evidence that Walker, Ezidore and Burnette ran from the scene, thus establishing some evidence of flight.
The jury instructions included the following:
*370 "If you find that the defendants fled immediately after a crime was committed or after they were accused of a crime, flight alone is not sufficient to prove that the defendants are guilty. However, that flight may be considered along with all the other evidence. You must decide whether such flight was due to consciousness of guilt or to other reasons unrelated to guilt."
Because there was testimony about flight after the crime was committed and because of the brevity of this instruction, when considered in connection with the remainder of the charge, the instruction on flight was neither erroneous nor prejudicial.
A verdict will not be set aside because of an objection to a portion of the trial court's charge unless such portion, when considered in connection with the remainder of the charge, is shown to be erroneous and prejudicial. See State v. Broussard, 202 La. 458, 12 So.2d 218 (1942), and subsequent cases with similar holdings.

EZIDORE'S NO. 9
Ezidore contends, in this final assignment of error, that the trial judge erred in not granting his motion for a new trial because (1) all elements of second degree murder were not proven, (2) the jurors, during deliberations, discussed the fact that Ezidore had not testified in his own behalf and (3) one juror, Wanda Steib, changed her vote after the verdict sheet had been completed.
The proof against both defendants has already been discussed. All elements of second degree murder were established by sufficient testimony and evidence if the jury accepted the statements of state witnesses Burnette and Dewey, which apparently was the case. The jury obviously was not swayed by the defendants' alibi defense.
When the motion for a new trial was heard, it was stipulated (1) that if juror Robert Benn was called, he would say that during final deliberations there was some discussion as to why Ezidore's mother was not called as a witness and why Ezidore did not take the stand and (2) that if juror Wanda Steib was called, she would say that she voted not guilty when polled in the jury room and that she later said, in open court, that her vote was guilty because she thought she was expressing the vote of the jury as a whole.
The state did call two jurors, Michael Davis, the foreman, and Joseph Givens. Davis, according to Ezidore's brief, said that after being selected foreman, he told the other jurors that they could not be prejudiced against Ezidore because he had not testified (confirming what the trial judge had advised in his charge and what had been emphasized during voir dire.) Givens said that he did not hear Davis make this statement.
Regardless, this state has a prohibition against a juror giving competent testimony concerning jury deliberations unless there is a claim of jury misconduct. Article 606(B) of the Louisiana Code of Evidence reads:
"Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental process in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes."
Here, Ezidore has not claimed that outside influence was improperly brought to bear on any juror or that any extraneous prejudicial information was improperly brought to the jury's attention. Even if all of Ezidore's allegations regarding the jurors were completely true, there was still no jury misconduct; therefore, an inquiry into the validity of the verdict was inadvertent.
*371 The verdict as announced in open court was 11 to one for guilty as charged. Steib's personal not guilty verdict would have changed the official jury verdict to 10 to two for guilty as charged. Only 10 jurors were needed for a conviction.
The conduct of any juror in this case did not infringe on the defendants' constitutional right to a fair trial by an impartial jury. On the record before us, we find no error in the trial judge's denial of Ezidore's motion for a new trial.
We did find, however, one error patent. While the transcripts of the sentencings indicates that both defendants were to receive credit for time served, the minute entry and commitment form for Ezidore do not reflect that he was given credit for time served; accordingly, we order that Ezidore's minute entry and commitment form be changed to show credit for time served. Otherwise, the convictions and sentences of both Walker and Ezidore are affirmed.
AFFIRMED AS AMENDED.
NOTES
[1] Ezidore actually assigned 14 errors but he did not brief five of the assignments, which were considered abandoned in accord with Uniform Rules, Court of Appeal, Rule 2-14.2.
[2] Walker's nickname for Dewey.